UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY P. SCIARRONE, BILLY DICKERSON, and JOSEPH RIVERA, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>CHARLES AMRICH, WAYNE SCHNELL, MARK BEESON, and THE VILLAGE OF ISLAND LAKE, ILLINOIS, )<br>)<br>Defendants. | No. 19 C 4584<br><br>Judge Sara L. Ellis |

## OPINION AND ORDER

Plaintiffs Anthony Sciarrone, Billy Dickerson, and Joseph Rivera used to work for the Village of Island Lake's ("the Village") police department. According to Plaintiffs, they uncovered evidence of criminal wrongdoing by Defendant Charles Amrich, the Village's mayor; Defendant Wayne Schnell, a former Building Commissioner and part-time police officer for the Village; and Defendant Mark Beeson, a former Village Trustee. Plaintiffs further allege that Amrich, Schnell, and Beeson ("the Individual Defendants") attempted to frustrate the resulting criminal investigations and retaliated against Plaintiffs by forcing them out of their jobs. Plaintiffs filed this lawsuit against the Individual Defendants and the Village. In their complaint, Plaintiffs claim that the Individual Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* (Count I), Defendants violated the Illinois Whistleblower Act, 740 Ill. Comp. Stat. 174/1 *et seq.* (Count II),[1] and the Village engaged in retaliatory discharge under Illinois common law (Count III). Defendants now move to dismiss the entirety of Plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6).

---

[1] Plaintiffs subsequently conceded that the Village is the only proper defendant for Count II.

The Court dismisses the RICO claim without prejudice because Plaintiffs have not adequately alleged a "pattern" of racketeering activity. Because the RICO claim is the only claim over which the Court has original jurisdiction, the Court relinquishes its jurisdiction over the Illinois Whistleblower Act and retaliatory discharge claims.

## BACKGROUND[2]

Schnell applied to become a police officer with the Village in 2006. He served part-time in this position until 2010, when he resigned after an internal investigation uncovered evidence that he had sexually harassed fellow female police officers. Later, in the spring of 2013, Schnell managed Amrich's campaign to become the Village's mayor. Amrich's "ticket" also included Beeson, who was running to become a Trustee for the Village. After Amrich won election as mayor, Schnell requested a review of the internal investigation report that led to his 2010 resignation from the Village police force. Sergeant Nicholas Deuter, a Village police officer and Schnell's friend, subsequently prepared a report (the "Deuter Report") that cleared Schnell of the previous harassment allegations. The Deuter Report relied, at least in part, upon affidavits from female police officers recanting their allegations of sexual harassment. As a result of the Deuter Report, the Village "reinstated" Schnell to his former jobs as a part-time police officer and "Building Commissioner/Code Enforcement Officer" in June 2013.[3] Doc. 1 ¶ 11, 13.

It is unclear for how long Schnell served in these positions. But Schnell presumably resigned from the police force at some point because in January 2018, he again applied to

---

[2] The Court takes the facts in the background section from Plaintiffs' complaint and the exhibit attached thereto and treats all well-pleaded, non-conclusory factual allegations as true for the purpose of resolving Defendants' motion to dismiss. *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013); *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

[3] Although Plaintiffs' use of the term "reinstated" implies that Schnell had previously served as a Building Commissioner/Code Enforcement Officer, Plaintiffs do not allege anything about Schnell's prior service, to the extent there was any.

become a part-time police officer. Sciarrone, the Village's Chief of Police at the time, assigned police officer Charles Mader to investigate Schnell's background in connection with his application. The investigation revealed that Schnell had lied on his 2006 police application by not disclosing a thirty-day suspension he had received at his previous job for avoiding work duties. After Sciarrone assigned Dickerson, another Village police officer, to participate in the investigation, Sciarrone, Dickerson, and Mader determined that the Deuter Report had relied upon "false" affidavits, i.e., the female police officers had lied when they signed the affidavits, which had been prepared by Schnell and presented to the officers by Deuter. *Id.* ¶ 12.

As it proceeded, the investigation began to focus on Schnell's relationship with Amrich and Beeson. Sciarrone, Dickerson, Mader, and Rivera, who came in as an extra investigator, discovered that Schnell did favors for Beeson while Amrich "look[ed] the other way." *Id.* ¶ 15. For instance, Schnell knew that Beeson was building a driveway at his house that was wider than what was allowed by village ordinance; he knew that the seawall at Beeson's home included a substantial amount of rock that the Village—not Beeson— had purchased; and he knew that Beeson had not obtained the required approval to modify the shoreline near his house. Yet Schnell did nothing, even though he was the Village's only Code Enforcement Officer and Building Commission employee. In addition, Schnell violated Village regulations by not keeping detailed records of his use of a government-assigned vehicle, by allowing his wife to drive the vehicle, by reporting excessive mileage, and by failing to identify which vehicle was driven when he submitted gas receipts. Amrich was aware of these violations, but he "did nothing." *Id.* ¶ 18. An unidentified Village Trustee also apprised Plaintiffs that Schnell and Beeson had solicited donations for various events from businesses in the Village without properly depositing the donations with the Village's Chief Financial Officer.

Based on their investigation, Plaintiffs became "[c]onvinced that Defendants had entered into a mutually beneficial corrupt enterprise." *Id.* ¶ 20. As Plaintiffs saw it, Amrich and the Village Board had rewarded Schnell for his help in getting Amrich elected by placing him in "two relatively high-paying Village posts," and in return, Schnell had allowed Beeson to violate Village ordinances that Schnell was supposed to enforce. *Id.* Plaintiffs also believed that Amrich "was countenancing if not encouraging the raiding of the Village fisc" and had allowed "Schnell to purge his personnel file of incriminating material." *Id.* Plaintiffs provided the results of their investigation to both the McHenry County State's Attorney and the FBI. The State's Attorney began investigating Beeson and Schnell, and the FBI opened a criminal investigation into the situation as well.

Deuter—the police officer who had written the 2013 report clearing Schnell of the sexual harassment allegations against him—found out about these investigations, and he told Schnell about them in April 2018. It was then that "Defendants entered upon a course of conduct designed to influence or obstruct [the] investigation and/or retaliate against Plaintiffs for having instituted it." *Id.* ¶ 23. On April 3, Schnell demanded that Sciarrone tell him why he was under investigation; Sciarrone refused. The next day, Beeson demanded that Amrich "give him the particulars of the investigation" and order "Sciarrone to stop the investigation." *Id.* ¶ 25. On April 5, David McArdle, the Village attorney, let Sciarrone know that Schnell wanted to purge his file of the information relating to his 2010 resignation. On April 24, Schnell sent a letter to Amrich and the Village Trustees asking them to stop the investigations. Two days later, Beeson arranged for the Village Board to vote on ordering Sciarrone to disclose information about the criminal investigations. On May 4, Schnell informed Sciarrone that Amrich had authorized Schnell to review his file in the presence of Sciarrone and McArdle.

4

On June 21, 2018, a McHenry County grand jury subpoenaed all records of building construction at Beeson's residence. During a July 26 executive session of the Village Board, Beeson complained about the investigation. In response to Beeson's complaints, McArdle suggested that firing Plaintiffs would be an effective means of stopping the investigation. Plaintiffs found out about this discussion, and on July 30, Rivera and Mader sent a memo to Sciarrone, Amrich, and Trustee Jennifer Villarreal. In the memo, Rivera and Mader complained about the recipients' failure to protect them, Sciarrone, and Dickerson as members of the police department actively engaged in a criminal investigation.[4] Rivera and Mader wanted the recipients to stop Schnell and Beeson from making certain comments and to immediately end the Village Board's attempt to remove Rivera and Mader from their positions. Rivera and Mader threatened to forward the memo to all news outlets servicing the Village if this did not happen.

Meanwhile, Schnell was falsely telling the Village Board that Plaintiffs were harassing him and "carrying out a 'vendetta.'" *Id.* ¶ 41. In August 2018, "at Beeson's request" and "with Amrich's concurrence," the Village hired a law firm to investigate Sciarrone and Dickerson based on their alleged harassment of Schnell and Beeson. *Id.* ¶ 34. The true goal of this investigation, however, was to find "a possible reason to terminate" Sciarrone's and Dickerson's employment. *Id.* Amrich relied upon the report generated by the law firm's investigation to place Sciarrone on administrative leave on September 27. The Village terminated Sciarrone four weeks later, on October 25, and Mader soon thereafter. In November, the Village informed Rivera that he had to switch from his position as an investigator to patrolman if he wanted to

---

[4] The memo asserts that Sciarrone is one of the individuals entitled to protection, so it is unclear why Rivera and Mader identified him as a recipient of the memo.

5

remain a part of the police force. Rivera resigned instead. On January 18, 2019, the Village discharged Dickerson from his position as a Village police officer.[5]

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago,* 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

**I.      Civil RICO Claim (Count I)**

In Count I of their complaint, Plaintiffs allege that they lost their jobs as a result of the Individual Defendants' RICO violations. The Individual Defendants contend that Plaintiffs do not adequately allege the required enterprise and the required pattern of racketeering activity elements of a civil RICO claim. The Court only addresses the Individual Defendants' argument

---

[5] Plaintiffs' complaint does not explicitly say who terminated Sciarrone, Dickerson, and Mader, or who determined that Rivera should only remain employed as a patrolman, but it alleges that "[a]s Mayor, Defendant Amrich was able to accomplish the desired result—the ultimate firing of Plaintiffs." Doc. 1 ¶ 41. Given this allegation, it is reasonable to infer that Amrich made (or at least initiated) these employment decisions. *See Virnich*, 664 F.3d at 212 ("[T]he court must . . . draw all reasonable inferences in the plaintiff's favor.").

regarding the "pattern" element because Plaintiffs' failure to adequately plead this element compels the Court to dismiss their RICO claim.

RICO "provides a civil cause of action for private plaintiffs" who have been "injured 'by reason of' a defendant's RICO violation." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 456 (2006); *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 336 (7th Cir. 2019). To state a claim under RICO, a plaintiff must sufficiently plead conduct of an enterprise through a pattern of racketeering activity. *Menzies*, 943 F.3d at 336. At issue here is the "pattern" requirement, which "was intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing the defendant as a person who regularly commits such crimes." *Lipin Enters. Inc. v. Lee*, 803 F.2d 322, 324 (7th Cir. 1986). "A pattern requires the commission of at least two predicate acts of racketeering activity occurring within ten years of each other." *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011). In addition, plaintiffs must satisfy the "continuity plus relationship" test: they must identify predicate acts of racketeering activity that are "related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)." *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 473 (7th Cir. 2007) (citation omitted); *see also Menzies*, 943 F.3d at 337.

Plaintiffs contend that the Individual Defendants engaged in racketeering activity by violating 18 U.S.C. § 1513(e).[6] *See DeGuelle*, 664 F.3d at 200 ("Under RICO, violations of [18 U.S.C.] § 1513 are considered 'racketeering activity.'"). Section 1513(e) prohibits "interference

---

[6] Plaintiffs' complaint also alleges that the Individual Defendants obstructed justice in violation of 18 U.S.C. § 1503. Plaintiffs, however, concede in their response to Defendants' motion to dismiss that they cannot rely upon § 1503 as a predicate act of racketeering because they cannot point to a federal judicial proceeding that was pending at the time of the alleged events. *See Browning v. Flexsteel Indus., Inc.*, 955 F. Supp. 2d 900, 918 (N.D. Ind. 2013) ("[T]o implicate 18 U.S.C. § 1503, the conduct must arise out of *federal* judicial proceedings . . . pending at the time of the obstruction."); *Davit v. Davit*, 366 F. Supp. 2d 641, 655 (N.D. Ill. 2004) ("[Section 1503] only applies to acts that relate to proceedings in the federal court system.").

with the lawful employment or livelihood of any person" in retaliation "for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense." According to Plaintiffs, the Individual Defendants violated § 1513(e) by seeking "to engineer Plaintiffs' respective firings" as retaliation for "giving truthful information to law enforcement officers (i.e., the FBI) regarding" the Individual Defendants' "possible commission of a Federal offense." Doc. 1 ¶¶ 1, 44. Specifically, after the Individual Defendants learned in April 2018 that they were under criminal investigation, Schnell falsely told the Village Board that Sciarrone and Dickerson were harassing him and "carrying out a 'vendetta'" against him. *Id.* ¶ 41. In August, Beeson, "with Amrich's concurrence," authorized the Village to hire a law firm to investigate Sciarrone and Dickerson "with the goal of finding a possible reason to terminate their employment." *Id.* ¶¶ 34, 41. Amrich relied upon the report generated by this law firm to put Sciarrone on administrative leave in September. *Id.* ¶ 35. The Village (presumably through Amrich) terminated Sciarrone in late October and Mader shortly thereafter. In November, the Village forced Rivera to resign by telling him that he could remain part of the police force only if he became a patrolman. And in January 2019, the Village discharged Dickerson.

For purposes of this opinion, the Court assumes that these allegations demonstrate violations of 18 U.S.C. § 1513(e).[7] Moreover, the Court concludes that these alleged § 1513(e)

---

[7] The Individual Defendants argue that Plaintiffs failed to properly allege violations of § 1513(e) because Plaintiffs' allegations do not show that the Individual Defendants' wrongdoing involved federal issues. This argument is not persuasive. Plaintiffs allege that after they provided information about the Individual Defendants' misconduct to the FBI, the FBI opened a criminal investigation into the situation. The FBI generally only investigates activities that may constitute federal crimes, and the Individual Defendants' alleged misconduct does not involve any of the narrow circumstances in which the FBI will investigate state law crimes. *See United States v. Rodgers*, 466 U.S. 475, 481 (1984) ("The FBI is authorized 'to detect and prosecute crimes against the United States.'" (quoting 28 U.S.C. § 533(1))); *A Brief Description of the Federal Criminal Justice Process*, FBI, https://www.fbi.gov/resources/victim-services/a-brief-description-of-the-federal-criminal-justice-process (last visited Apr. 17, 2020) ("Federal

violations are sufficiently related. A plaintiff pleads the "relationship" prong of the "continuity plus relationship" test by identifying "acts of criminal conduct close in time and character, undertaken for similar purposes, or involving the same or similar victims, participants, or means of commission." *Menzies*, 943 F.3d at 337. The Individual Defendants' alleged retaliatory acts all took place within a relatively short period of time, approximately nine to ten months (April 2018 through January 2019). The acts all targeted similar victims—individuals who were investigating the Individual Defendants' conduct—and were carried out by the individuals who were being investigated. The Individual Defendants also committed these acts with the same purpose: to force the victims (Plaintiffs) out of their positions with the Village. *See Roger Whitmore's Auto. Servs., Inc. v. Lake Cty.*, 424 F.3d 659, 672 (7th Cir. 2005) (assuming that the predicate acts of racketeering met the relationship prong because they were all carried out for the same purposes). Given "the relatively broad relationship standard," *DeGuelle*, 664 F.3d at 203 (internal quotation marks omitted), as well as the Individual Defendants' failure to challenge the relatedness of the alleged predicate acts, the Court finds that Plaintiffs' complaint satisfies the "relationship" prong of the "continuity plus relationship" test.

But Plaintiffs must also satisfy the "continuity" prong of this test. *Menzies*, 943 F.3d at 337. To satisfy this prong, a plaintiff must plead either an "open-ended" or a "closed-ended" series of criminal conduct. *Id.* And this is where Plaintiffs' complaint comes up short.

---

law enforcement agencies will investigate a crime only if there is reason to believe that the crime violated federal law."); *Where Is the FBI's Authority Written Down?*, FBI, https://www.fbi.gov/about/faqs/where-is-the-fbis-authority-written-down (last visited Apr. 17, 2020) (explaining that the FBI has "special investigative jurisdiction to investigate . . . felony killings of state law enforcement officers . . . , violent crimes against interstate travelers . . . , and serial killers"). The FBI's alleged initiation of an investigation here therefore indicates that Plaintiffs provided the FBI with "information relating to the commission or possible commission of any Federal offense." 18 U.S.C. § 1513(e); *see also Iqbal*, 556 U.S. at 679 (a court evaluating a complaint must "draw on its judicial experience and common sense").

### A. Continuity Based on Open-Ended Conduct

An open-ended series of misconduct is not "inherently terminable"; it "threatens repetition and thus future harm" by "its intrinsic (e.g., business-as-usual) nature." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 829 (7th Cir. 2016); *Gamboa v. Velez*, 457 F.3d 703, 706 (7th Cir. 2006). The open-ended continuity inquiry "focuses not on what acts occurred in the past but on whether a concrete threat remains for the conduct to continue moving forward." *Menzies*, 943 F.3d at 337. A plaintiff can demonstrate this threat in one of three ways: "by showing that a defendant's actions pose a specific threat of repetition; that the predicate acts form part of the defendant's ongoing and regular way of doing business; or that the defendant operates a long-term association for criminal purposes." *Id.* Plaintiffs do not contend that the Individual Defendants' retaliatory acts were part of an ongoing and regular way of doing business or that the Individual Defendants operate a long-term criminal association. Thus, whether Plaintiffs have adequately alleged open-ended continuity depends on whether they have alleged retaliatory acts that pose a specific threat of repetition.

Plaintiffs have not done so. Because schemes that "have a clear and terminable goal have a natural ending point," they do not pose a threat of repetition. *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 782–83 (7th Cir. 1994); *see also Empress Casino*, 831 F.3d at 829 ("We have repeatedly held that schemes fail to satisfy open-ended continuity where they have a 'natural ending point.'"). Yet that is precisely what Plaintiffs have alleged here—a retaliatory scheme with a "clear and terminable goal" and a "natural ending point." The scheme's goal was to remove Plaintiffs from the Village's police force. Once the Individual Defendants accomplished this goal, the alleged retaliation was complete, and no more retaliatory conduct was necessary. In other words, the Individual Defendants' alleged scheme of retaliation

10

naturally ended when they had forced every Plaintiff out of his job. There is therefore no threat of repeated criminal activity that could support an open-ended theory of continuity. *See, e.g.*, *Empress Casino*, 831 F.3d at 829–30 (finding that "[n]o specific threat of repetition existed" where the alleged scheme had a natural ending point); *Roger Whitmore's*, 424 F.3d at 674 (finding that the plaintiff "pleaded himself out of showing a continuing threat of continued activity[] because the alleged scheme had a natural ending point"); *Vicom*, 20 F.3d at 782–83 (finding that the plaintiff "basically concede[d] that there existed no specific threat of continued racketeering activity" by alleging "a scheme that had a natural ending point").

      Plaintiffs contend that the Individual Defendants' actions could be considered an open-ended scheme because the termination of Mader (who is not a plaintiff) shows that the Individual Defendants will "continue to do the same thing to anyone who got in [their] way," and "it is not far-fetched to believe that the enterprise would not stop with Plaintiffs." Doc. 14 at 7. This contention is without merit. Plaintiffs allege that Mader was fired "[s]oon thereafter" Sciarrone's October 25, 2018 termination, Doc. 1 ¶ 35, which suggests that the Village fired Mader well before the scheme ended almost three months later with Dickerson's discharge. So Mader's termination does nothing to suggest that the Individual Defendants' misconduct would *continue* after the scheme ended. Nor are there any facts alleged in the complaint that support the notion that the Individual Defendants would retaliate against other Village employees in the future. Indeed, given that all the individuals involved in the investigation—Sciarrone, Dickerson, Rivera, and Mader—were out by January 18, 2019, there was no one else to retaliate against after that date. It simply is not reasonable to infer based on Plaintiffs' allegations that the Individual Defendants' scheme would not stop with Plaintiffs. Rather, this is a bald assertion

11

that does not help Plaintiffs satisfy their burden to plead continuity. *See Menzies*, 943 F.3d at 342–43; *Vicom*, 20 F.3d at 783.

For these reasons, Plaintiffs have not alleged continuity based on an open-ended series of misconduct. The Court must now consider whether Plaintiffs have sufficiently alleged continuity based on a closed-ended series of misconduct.

### B. Continuity Based on Closed-Ended Conduct

A closed-ended theory of continuity "involves a course of criminal conduct that has ended" but that, by the length of its duration, "carries with it an implicit threat of continued criminal activity in the future." *Jennings*, 495 F.3d at 473 (citation omitted); *Roger Whitmore's*, 424 F.3d at 672. Because the closed-ended inquiry "asks whether there were enough predicate acts over a finite time to support a conclusion that the criminal behavior would continue," the inquiry focuses on what are known as the *Morgan* factors: "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes[,] and the occurrence of distinct injuries." *Menzies*, 943 F.3d at 337 (citation omitted); *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986). No one factor is dispositive; rather, a court is to consider the *Morgan* factors "with the goal of achieving a natural and commonsense result, consistent with Congress'[] concern with long-term criminal conduct." *Roger Whitmore's*, 424 F.3d at 673 (internal quotation marks omitted). Considering the *Morgan* factors, the Court finds that Plaintiffs have not adequately alleged a closed-ended pattern of racketeering activity.

The Court begins with the duration of the alleged activity, which "is the single most important aspect of the closed-ended continuity analysis." *Vicom*, 20 F.3d at 781. Here, the complained-of acts took place between April 2018 (at the earliest), when the Individual

12

Defendants discovered that they were under criminal investigation, and January 2019 (at the latest), when the Village fired Dickerson. Although the Seventh Circuit has "not employed a bright-line rule for how long a closed period must be to satisfy continuity," this duration of only nine to ten months does not "qualify as 'substantial' enough to satisfy continuity." *See Roger Whitmore's*, 424 F.3d at 673. For instance, *Jennings* found that a nearly identical duration of ten months was "too short to show the necessary continuity for a 'pattern' of racketeering." 495 F.3d at 469, 473–74 (affirming Rule 12(b)(6) dismissal of civil RICO claim). And in *Midwest Grinding Co. v. Spitz*, the appellate court similarly found that a closed-ended scheme allegedly lasting, at most, nine months was not long enough to satisfy the continuity requirement. 976 F.2d 1016, 1023–24 (7th Cir. 1992). Indeed, the Seventh Circuit has found closed-ended schemes lasting "*several years*" insufficient. *Roger Whitmore's*, 424 F.3d at 673 (two-year scheme); *see also Midwest Grinding*, 976 F.2d at 1024 (citing several Seventh Circuit cases that found schemes lasting for more than a year to be insubstantial in duration). This factor alone weighs heavily against a finding of closed-ended continuity. *See Jennings*, 495 F.3d at 475 (noting that the alleged scheme's ten-month duration "alone might be enough to dispose" of the closed-ended continuity issue).

The remaining *Morgan* factors, on balance, cut against such a continuity finding as well. The alleged predicate acts affected only a few individuals (Sciarrone, Dickerson, Rivera, and, Mader) and were all committed in furtherance of a single scheme with the sole purpose of retaliating against these individuals for their participation in a criminal investigation. *See Roger Whitmore's*, 424 F.3d at 673–74 (finding that "a single, isolated scheme" with only twelve or so victims supported "the conclusion that [the plaintiff] has not shown closed-ended continuity"). Each alleged victim also suffered the same injury as a result of the same alleged scheme: the loss

13

of his job. *See Vicom*, 20 F.3d at 782 (concluding that the plaintiff's alleged losses on cancelable or potentially cancelable leases were not distinct because they stemmed "from the same original contract and similar predicate acts"). Moreover, the complaint alleges, at most, a handful of retaliatory acts: Schnell's false complaints of harassment, Beeson's authorization to hire a law firm to investigate Sciarrone and Dickerson, Amrich putting Sciarrone on administrative leave, and Amrich forcing each of the three Plaintiffs and Mader to leave their jobs (either through firing or other means). *See Roger Whitmore's*, 424 F.3d at 673 (characterizing "several different instances of [alleged] mail fraud," various phone calls, and a "handful of face-to-face meetings" as a "fairly small number of predicate acts [that] cut[] against showing continuity"). Finally, while there is some variety among the alleged predicate acts, most of them are adverse employment actions and, in any event, Plaintiffs allege that all these acts violate the same criminal statute, 18 U.S.C. § 1513(e).

But even if the *Morgan* factors had tipped the scales in favor of closed-ended continuity, the Court would still find such continuity lacking. *See Gamboa*, 457 F.3d at 709–10 (reversing a finding of continuity that was supported by an analysis of the *Morgan* factors). The Seventh Circuit has explained that where a

> complaint explicitly presents a distinct and non-reoccurring scheme with a built-in termination point and provides no indication that the perpetrators have engaged or will engage in similar misconduct, the complaint does not sufficiently allege continuity for § 1962(c) purposes even if the purported scheme takes several years to unfold, involves a variety of criminal acts, and targets more than one victim.

*Id.* at 709; *accord Kaye v. D'Amato*, 357 F. App'x 706, 716 (7th Cir. 2009). For example, in *Gamboa*, the plaintiff alleged that the defendants, Chicago police detectives, committed a variety of criminal offenses (such as influencing a grand jury, obstructing a criminal investigation,

14

extortion, and witness tampering) over five-plus years in an effort to frame the plaintiff and four other individuals for murder and then cover it up. 457 F.3d at 704–05, 707–08. The district court, after considering the *Morgan* factors, had found these allegations to demonstrate continuity; the Seventh Circuit, however, found that these allegations in fact "foreclosed any threat of continued criminal activity." *Id.* at 709. As the *Gamboa* court explained, "the criminal activity, as alleged, had a built-in end point: once the frame-up was put to rest, the scheme was over." *Id.* at 708. Furthermore, the complaint did not include any basis to suggest misconduct by the defendants beyond this alleged scheme "or to otherwise indicate that the detectives have repeated or will repeat their alleged unlawful behavior." *Id.*

Here, Plaintiffs' complaint similarly fails to suggest that the Individual Defendants had engaged in the complained-of retaliatory misconduct before they became aware of Plaintiffs' criminal investigation. Nor does the complaint suggest that the Individual Defendants engaged in similar misconduct after Plaintiffs left the Village's employ. Like the scheme in *Gamboa*, the scheme Plaintiffs allege had a "built-in end point": the removal of Plaintiffs from the Village's police force. As already touched upon, once the Individual Defendants accomplished this goal, the alleged retaliation was complete, and no more criminal conduct was necessary. Plaintiffs' complaint alleges a scheme that inherently forecloses a finding of closed-ended continuity. *See Gamboa*, 457 F.3d at 709; *Kaye*, 357 F. App'x at 716 (finding that the plaintiff did not demonstrate closed-ended continuity because, among other things, the alleged scheme would have ended once its goal was accomplished).

### C. Dismissal Without Prejudice

Based on its review of Plaintiffs' allegations and its analysis of the law, the Court is skeptical that Plaintiffs can adequately allege that the Individual Defendants engaged in a

15

"pattern" of misconduct that RICO was intended to address. Moreover, as the Court has not analyzed the sufficiency of Plaintiffs' "enterprise" or other RICO allegations, those allegations may also be insufficient to support a civil RICO claim. Even so, when a court dismisses a claim pled in the original complaint under Rule 12(b)(6), it should ordinarily give the plaintiff at least one opportunity to amend the claim before dismissing it with prejudice. *See NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 310–11 (7th Cir. 2018); *Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008). And Defendants have not identified any good reason—such as futility, undue delay, undue prejudice, or bad faith—that warrants denying Plaintiffs an initial opportunity to amend their RICO claim or any of their other claims. *See NewSpin Sports*, 910 F.3d at 310. The Court therefore dismisses Count I without prejudice and grants Plaintiffs leave to amend their complaint.

## II. State Law Claims (Counts II and III)

Having dismissed Plaintiffs' only federal claim, the Court must decide whether it has jurisdiction to hear Plaintiffs' Illinois Whistleblower Act and retaliatory discharge claims, which seek relief under Illinois law. *See Halperin v. Int'l Web Servs., LLC*, 70 F. Supp. 3d 893, 903 (N.D. Ill. 2014). Because Plaintiffs refer to these claims as "associated pendent state law claims," Doc. 1 ¶ 1, it appears that they rely upon the Court's supplemental jurisdiction under 28 U.S.C. § 1367(a) for these claims. *See NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 237 (7th Cir. 1995).

When a court in this circuit dismisses all claims supporting federal jurisdiction, as the Court has done here, it typically relinquishes jurisdiction over any supplemental state law claims by dismissing them without prejudice.[8] *Vargas v. Cook Cty. Sheriff's Merit Bd.*, 952 F.3d 871,

---

[8] There are some exceptions to this general rule, *Dargis v. Sheahan*, 526 F.3d 981, 990 (7th Cir. 2008), but the Court does not address these exceptions because Plaintiffs did not argue in their response that any

876 (7th Cir. 2020); *Hagan v. Quinn*, 867 F.3d 816, 830 (7th Cir. 2017). The Court finds that to be the proper course here, especially because the Illinois Whistleblower Act and retaliatory discharge claims seek to find the Village, a local governmental unit, liable for violating state law. *See Myers v. Cty. of Lake*, 30 F.3d 847, 849 (7th Cir. 1994) ("How far state law exposes state and local agencies to liability is a delicate question that federal judges should hesitate to tackle."). The Court therefore dismisses the Illinois Whistleblower Act and retaliatory discharge claims without prejudice. Plaintiffs may use the opportunity to amend their complaint to re-plead their state law claims against the Village, but Plaintiffs should consider what effect, if any, doing so may have on their ability to bring these claims in state court should they remain unable to adequately plead a civil RICO claim.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss [11] and dismisses Plaintiffs' complaint without prejudice. The Court gives Plaintiffs 21 days to amend their complaint if they can do so consistent with Federal Rule of Civil Procedure 11.

Dated: June 3, 2020

SARA L. ELLIS
United States District Judge

---

of them are present, *see Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) ("[A] party generally forfeits an argument or issue not raised in response to a motion to dismiss.").